**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 25-cv-00211-NYW-KAS

LUCAS CROSTAROSA, individually, and on behalf of all others similarly situated,

    Plaintiff,

v.

LAZ PARKING LTD.;
ASURA TECHNOLOGIES USA, INC.; and
PARKING REVENUE RECOVERY SERVICES, INC.,

    Defendants.

---

## ORDER ON MOTION TO COMPEL ARBITRATION

---

This matter comes before the Court on Defendants Asura Technologies USA, Inc. and Parking Revenue Recovery Services, Inc.'s Motion to Compel Arbitration, [Doc. 15, filed on March 6, 2025][1] ("Motion to Compel Arbitration"), and Defendant LAZ Parking Ltd.'s Motion for Leave to Join in Motion to Compel Arbitration, [Doc. 24, filed on March 12, 2025] ("Joinder Motion"). The Court concludes that oral argument will not materially assist in the resolution of this matter. Having considered both Motions and the associated briefing, the applicable case law, and the entire docket, the Motion to Compel Arbitration is **GRANTED in part** and **DENIED in part**, and the Joinder Motion is **GRANTED**.[2] The

---

[1] Where the Court refers to the filings made in the Electronic Court Filing ("ECF") system in this action, it uses the convention [Doc. ____]. When the Court refers to the ECF docket number for a different action, it uses the convention ECF No. ____. In either case, the Court identifies the page number as assigned by the ECF system.

[2] Mr. Crostarosa does not oppose LAZ's Joinder Motion, and his Opposition to the Motion to Compel Arbitration proceeds as though LAZ moved to compel arbitration as well. *See* [Doc. 25 at 14 ("All three Defendants jointly moved to compel arbitration.")]. Accordingly,

Motion to Compel Arbitration ruling is as follows:  **GRANTED** as to Plaintiff's claim against
Defendant Parking Revenue Recovery Services, Inc. ("PRRS") and **DENIED** as to
Plaintiff's claims against Defendants Asura Technologies USA, Inc. ("Asura") and LAZ
Parking Ltd. ("LAZ").

### BACKGROUND[3]

LAZ provides parking management services all over the country, including
Colorado.  [Doc. 1 at ¶ 2].  PRRS enforces parking payments for facilities managed by
LAZ, and it does so by using a video analytics system technology from Asura.  [*Id.* at
¶¶ 4–6].  When Defendants deem that a vehicle has not properly paid for parking in a lot
managed by LAZ, Defendants use PRRS's license plate recognition technology to obtain
the motor vehicle records associated with that vehicle.  [*Id.* at ¶¶ 7–8].  PRRS then uses
the information in the records to mail a parking notice to the registered owner's home
address.  [*Id.* at ¶¶ 8–9].  The notice explains, among other things, what the parking
violation was, where the violation took place, and the amount owed, and includes
timestamped photos of the vehicle entering and exiting the parking location.  [*Id.* at ¶¶ 10–
12].

On or about February 25, 2022, Plaintiff Lucas Crostarosa ("Plaintiff" or "Mr.
Crostarosa") parked at a parking lot managed by LAZ in Denver, Colorado, at 2000
Larimer St. (the "Lot").  [*Id.* at ¶ 41].  Mr. Crostarosa did not pay for parking.  [Doc. 25-4

---

the Joinder Motion is **GRANTED**, and the Court extends PRRS's and Asura's arguments
to LAZ.

[3] The Court takes these facts from Plaintiff's Complaint and accepts them as true for
purposes of this Order.  *See Munoz v. Conduent State & Loc. Sols., Inc.*, No. 24-2044,
2025 WL 799482, at *1 n.2 (10th Cir. Mar. 13, 2025); [Doc. 15 at 7 n.1].

at ¶ 10].  The following month, on or about March of 2022, Mr. Crostarosa received a parking notice from PRRS in the mail at his home address, stating that no payment was received for his time in the Lot.  [Doc. 1 at ¶ 43].  The notice also stated that Mr. Crostarosa's balance on his citation is $80.  [*Id.*].

On January 21, 2025, Mr. Crostarosa initiated this putative class action.  He invokes the Court's federal question jurisdiction by asserting a single cause of action, alleging that Defendants' access and use of motor vehicle records violated the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721–2725 ("DPPA").  [Doc. 1 at ¶¶ 16, 26, 38–39, 50, 62–69].  The DPPA authorizes a private right of action when an entity "knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted" under 18 U.S.C. § 2721, and the information pertains to the individual bringing suit.  18 U.S.C. § 2724(a); *Miller v. Image Data LLC*, 91 F. App'x 122, 125 (10th Cir. 2004).  Asura and PRRS filed the instant Motion to Compel Arbitration on March 6, 2025, [Doc. 15], and LAZ filed its Motion for Leave to Join in Motion to Compel Arbitration on March 12, 2025, [Doc. 24].

Defendants argue that by parking in the Lot, Mr. Crostarosa entered a contract with Defendants, and that contract includes an arbitration provision.  *See* [Doc. 15 at 5–6; Doc. 24 at ¶ 4].  Defendants seek an order enforcing that arbitration provision and a stay of this matter pending completion of arbitration.  [Doc. 15 at 5–6].  Mr. Crostarosa opposes Defendants' motions, contending that he never agreed to any contract with Defendants because the signs displaying the contract were not conspicuous, but even if he did agree to that contract, his DPPA claim does not fall within the arbitration provision and LAZ and Asura may not compel arbitration because they are not parties to the

contract.  *See generally* [Doc. 25].

## LEGAL STANDARD

"There is a strong federal policy favoring arbitration for dispute resolution, and this policy 'requires a liberal reading of arbitration agreements.'"  *GATX Mgmt. Servs., LLC v. Weakland*, 171 F. Supp. 2d 1159, 1162 (D. Colo. 2001) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23 n.27 (1983)).  The Federal Arbitration Act ("FAA") provides that contractual agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 3 of the FAA obligates courts to stay litigation on matters that the parties have agreed to arbitrate, while section 4 authorizes a federal district court to compel arbitration for a dispute over which it would have jurisdiction.  *See* 9 U.S.C. §§ 3, 4.  "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

But because "arbitration is a matter of contract," the Court cannot require a party "to submit to arbitration any dispute which he has not agreed so to submit."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quotation omitted).  "Although the Supreme Court has long recognized and enforced a liberal federal policy favoring arbitration agreements . . . the question whether parties have a valid arbitration agreement at all is a gateway matter that is presumptively for courts to decide."  *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 611 (10th Cir. 2014) (cleaned up); *see also Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 832 (10th Cir. 2023) ("A court addressing a

motion to compel arbitration therefore must first determine whether there exists an enforceable agreement to arbitrate." (citation omitted)).  And "when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made by the parties, [the court] should give to the opposing party the benefit of all reasonable doubts and inferences that may arise."  *Vernon v. Qwest Comm. Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012) (quotation omitted), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013).

Then, the court "determine[s] such matters as . . . whether the agreement covers a particular controversy."  *Brayman*, 83 F.4th at 832 (cleaned up); *see also Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018) (after first finding a valid agreement to arbitrate, the second step requires a court to determine whether the allegations in the complaint are within the scope of the arbitration provision).  The party seeking to compel arbitration bears the burden of establishing that the matter at issue is subject to arbitration.  *See Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012) (where parties dispute the existence of an agreement to arbitrate, movant must prove "there are no genuine issues of material fact regarding the parties' agreement" (quotation omitted)); *GATX*, 171 F. Supp. 2d at 1162.

**ANALYSIS**

## I.    Agreement to Arbitrate

The first step of the Court's arbitrability inquiry asks whether the Parties entered into a valid agreement to arbitrate.  *Brayman*, 83 F.4th at 832.  Whether a valid agreement to arbitrate exists "is simply a matter of contract between the parties."  *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013) (quotation omitted).

Accordingly, courts apply "ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Id.* (quotation omitted).

Because the Parties appear to agree that Colorado law applies here, *see* [Doc. 15 at 9–10 (arguing that the arbitration clause is enforceable "[i]n accordance with the FAA and Colorado law"); Doc. 25 at 7–11 (citing Colorado law and applying Colorado contract law principles)], the Court proceeds accordingly, *see Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption."). "To be enforceable, a contract requires mutual assent to an exchange between competent parties for legal consideration." *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022). "Under Colorado law, a contract requires a 'meeting of the minds.'" *Bellman*, 563 F. App'x at 613. "The requisite meeting of the minds is established by the parties' acts, conduct, and words, along with the attendant circumstances, and not by any subjective, unexpressed intent by either party." *French*, 509 P.3d at 449; *see also Leica Geosystems, Inc. v. L.W.S. Leasing, Inc.*, 872 F. Supp. 2d 1191, 1198 (D. Colo. 2012) ("An offer and assent may be manifested by acts or conduct creating a contract.").

Mr. Crostarosa disputes both the existence of a contract in this case and that he agreed to arbitrate this dispute. Defendants argue that Mr. Crostarosa did agree to a contract by parking in the Lot, and that contract states, among other things, that there is "no free parking at any time" and "[b]y parking on this Lot, you hereby agree that the sole remedy for an unresolved dispute is binding arbitration." [Doc. 15 at 11–12; Doc. 15-3 at 2–4 (the "Contract"); Doc. 28 at 8]. This Contract, Defendants highlight, was posted on

big signs in multiple places throughout the Lot, including at the Lot's entrance and exit. [Doc. 15-1 at ¶ 4; Doc. 15-3 at 2–4]. For his part, Mr. Crostarosa does not dispute that the Contract was posted on multiple signs around the Lot but argues that the signs were not sufficiently conspicuous and he did not see them. *See* [Doc. 25 at 8–10]. Because he did not see the signs, Mr. Crostarosa concludes that he was not on notice that his conduct of parking in the Lot had any "contract-forming effect" that would bind him to any agreement, and therefore he did not assent to the Contract, let alone agree to arbitrate. *See* [*id.* at 7–11].

The Court respectfully disagrees with Mr. Crostarosa that his conduct did not have a contract-forming effect. On the contrary, a reasonable driver knows that when they park in a parking lot, they agree to an implied contract with the lot owner: the lot owner allows the driver to park on their property, and the driver agrees to follow the rules laid out by the lot owner, including paying the required rates. If the driver does not follow the rules or does not pay, they may be subject to a ticket or their car being towed. The driver is free to leave the lot without parking if he does not want to agree to these implied terms. "This exchange, on its own, is sufficient to meet the basic criteria necessary to establish formation of a contract." *Butler v. Asura Techs. USA, Inc.*, No. 24-cv-00529-DDD-STV, slip op. at 4 (D. Colo. Oct. 7, 2024), ECF No. 33 ("*Butler* Order") (citing *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011)).

Of course, the rules of the parking lot must be reasonably conspicuous such that a driver knows or can easily find out what they are agreeing to by parking in the lot. *See Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1026 (D. Colo. 2012) (whether a contract was formed requires ascertaining whether the contractual terms were

"reasonably conspicuous"). If the term is hidden or obscured, there can be no presumption that there was a meeting of the minds as to that term. *Id.*

Here, the Court finds that the Contract—and the agreement to binding arbitration within (the "Arbitration Agreement")—was conspicuous. As the undisputed exhibits to the Motion to Compel Arbitration show, there were multiple large red signs with the Contract posted throughout the Lot:



[Doc. 15-1 at ¶ 4; Doc. 15-3 at 2–4]. These signs were posted in areas where a reasonable driver would see them, such as the payment kiosk and by the lot entrance and exit. [Doc. 15-1 at ¶ 4; Doc. 15-3 at 2–4]. As reflected above, the words in the sign are in white font set against a bright red backdrop, an all-caps larger font is used for headers including "ARBITRATION," and the sign is split into three easy-to-read

paragraphs. [Doc. 15-1 at ¶ 4; Doc. 15-3 at 2–4];[4] *cf.* Colo. Rev. Stat. § 4-1-201, cmt. 10 (relevant factors in determining whether a term is conspicuous include the use of headings and text that contrast with the surrounding text, placement of the term in the larger context, and the effort needed to access the term). Those three paragraphs constitute essential terms of the Contract: (1) there is no free parking at any time; (2) the Lot's rules and use limitations are strictly enforced including via License Plate Recognition technology; and (3) by parking on this Lot, the customer agrees that arbitration is the sole remedy for an unresolved dispute. [Doc. 15-1 at ¶ 4; Doc. 15-3 at 2–4].

Mr. Crostarosa's failure to see the signs because it was dark out and because he did not pay for parking, *see* [Doc. 25 at 8; Doc. 25-4 at ¶¶ 9–11], is legally insignificant. "A contract was formed between the parties when Plaintiff[] manifested assent to the implied terms of the agreement: temporary use of a parking spot in exchange for a promise to pay if necessary." *Butler* Order at 5–6 (citing *E-21 Eng'g, Inc. v. Steve Stock & Assocs., Inc.*, 252 P.3d 36, 39 (Colo. App. 2010)). "A reasonable person in Plaintiff['s] position would have understood the basic nature of this exchange as well as the fact that it constituted a binding agreement, breach of which would have resulted in additional fees or penalties." *Id.* at 6. If Mr. Crostarosa wanted to learn what terms govern this parking agreement, he could have read the conspicuous red signs. *See Weller v. HSBC Mortg. Servs., Inc.*, 971 F. Supp. 2d 1072, 1080 (D. Colo. 2013) ("A party generally cannot avoid contractual obligations by claiming that he or she did not read the agreement." (quotation

---

[4] The sign depicted in Exhibit 2 of the Motion to Compel Arbitration, [Doc. 15-2], was not posted when Mr. Crostarosa parked at the Lot in 2022, *see* [Doc. 15-1 at ¶ 3]. Therefore, it is irrelevant to the instant Motion. *See* [Doc. 28 at 10 n.3 (Defendants conceding in their Reply that "[a]ny reference to the language from the Contract in [Doc. 15-2] instead of [Doc. 15-3] in the Motion was inadvertent scrivener's error")].

omitted)); *see also Lasser v. Charter Commc'ns, Inc.*, No. 19-cv-02045-RM-MEH, 2020 WL 1527333, at *3 (D. Colo. Mar. 31, 2020) (finding that a plaintiff is bound to an arbitration agreement which he "had the resource to access – and open, read, and understand," even though he did not do so). Indeed, Mr. Crostarosa was on notice that there were terms associated with parking in the Lot because of the very large, bright "PUBLIC PARKING" sign outside of the Lot listing the parking rates. *See* [Doc. 1 at ¶ 41].

Finding that the Contract was sufficiently conspicuous and Plaintiff manifested assent to the Arbitration Agreement by parking in the Lot, the final question for the Court to address is which of the Defendants are on the other side of the Contract. The Parties appear to agree that only Plaintiff and PRRS are parties to the Contract, and Asura and LAZ are non-parties. *See* [Doc. 25 at 14–17 (Plaintiff arguing that the Contract only mentions PRRS, and Asura and LAZ cannot compel Plaintiff to arbitrate based on the Contract); Doc. 28 at 12–13 (Defendants conceding that Asura and LAZ are "nonparties" to the Arbitration Agreement)].

As a result of the above analysis, the Court determines that the Arbitration Agreement is a valid and enforceable agreement between Mr. Crostarosa and PRRS.

## II.  Mr. Crostarosa's Claim against PRRS Falls Within the Scope of the Arbitration Agreement

Next, the Court must determine whether Mr. Crostarosa's claim against PRRS falls within the scope of the Arbitration Agreement. "The factual allegations which form the basis of the claim asserted, rather than the legal cause of action pled," determine "whether a particular dispute falls within the reach of the [arbitration] clause." *City & Cnty. of Denver v. Dist. Ct.*, 939 P.2d 1353, 1364 (Colo. 1997). "If the allegations underlying the claim[] touch matters covered by the parties' [arbitration agreement], then those claims must be

arbitrated, whatever the legal labels attached to them." *Burlington N. & Santa Fe Ry. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 570 (10th Cir. 2010) (quotation omitted).

Mr. Crostarosa argues that the Arbitration Agreement is "narrow," and that the dispute at issue is "merely collateral to the agreement." [Doc. 25 at 14]. In support of his argument that the Arbitration Agreement is narrow, Mr. Crostarosa cites two cases, *Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258 (10th Cir. 2005) and *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825 (2d. Cir. 1988). [*Id.* at 13]. However, these cases are not factually analogous to this case because they concern arbitration agreements that were explicitly limited to specific subject matters. *See Cummings*, 404 F.3d at 1262 ("[T]he parties clearly manifested an intent to narrowly limit arbitration to specific disputes regarding the termination of the Operating Agreement."); *McDonnell*, 858 F.2d at 832 (arbitration clause at issue "is limited to the context of Paragraph 4N and the circumstances that might surround the utility's decision to seek redemption pursuant to that Paragraph"). Here, there is no limitation on what kind of dispute is subject to arbitration—instead, the Contract mandates that arbitration is "the sole remedy for an unresolved dispute." *See* [Doc. 25 at 12; Doc. 28 at 10].

Despite the lack of any explicit limitations in the Arbitration Agreement, Mr. Crostarosa contends that the Arbitration Agreement's use of the term "*an* unresolved dispute" rather than "*all* unresolved disputes" or "*any and all* disputes" signifies that the Arbitration Agreement is narrow in scope. [Doc. 25 at 5–6, 12–14]. On this basis, Mr. Crostarosa attempts to distinguish this case from *Butler*, No. 24-cv-00529-DDD-STV, where another court in this District compelled arbitration in a case with similar facts and

a similar arbitration provision. *See* [*id.*]. The Court is respectfully unpersuaded.

Like this case, *Butler* is a DPPA case where the plaintiffs parked in lots monitored by Asura and PRRS, those lots were monitored by Asura's video analytics technology for parking enforcement, and the plaintiffs later received parking notices mailed to their homes stating that no payment was received for their time in the lots. *Butler* Order at 2–3. The parking lots in *Butler* had large, conspicuous, red signs stating that "[b]y parking on this Facility, you hereby agree that the sole remedy for all unresolved disputes is binding arbitration." *Id.* at 3. The court found that the DPPA claim "is clearly within the scope of this statement," because it "pertains to the Plaintiffs' use of the lots monitored by Defendants." *Id.*

Mr. Crostarosa argues that the Contract here is different from the one in *Butler*—and therefore the Court's conclusion regarding whether the DPPA claim is within the scope of the Arbitration Agreement should be different—because the provision in *Butler* applied to "all unresolved disputes" whereas the arbitration clause here pertains to "an unresolved dispute." *See* [Doc. 25 at 5–6, 13]. Mr. Crostarosa does not cite any legal authority making this distinction between "all" and "an" but contends that "it was the mention of 'all' that ultimately led to the *Butler* court's conclusion to compel arbitration." *See* [*id.* at 5–6]. The Court respectfully disagrees. The *Butler* court's analysis regarding whether the DPPA claim is within the scope of the arbitration agreement contains no discussion of the importance of the word "all."

The Court discerns no legally significant difference between "an unresolved dispute" and "all unresolved disputes" in terms of the scope of the Arbitration Agreement. The article "an" means "any," which in the context of determining which disputes are

covered by the Arbitration Agreement essentially operates the same as "all." *See, e.g.*, *Williams v. Fundingsland*, 221 P. 1084, 1085–86 (Colo. 1923) (ruling that in interpreting the phrase "[i]f any of my children should die without issue, or without leaving a husband or wife him or her surviving," "[t]he indefinite article 'a' means one or any, and in this case it would seem to mean 'any'"); *United States v. Hernandez*, 107 F.4th 965, 969 (11th Cir. 2024) ("Usage guides confirm what we all know—that the indefinite 'a' points to a nonspecific object, thing, or person that is not distinguished from the other members of a class. Indeed, we've gone so far as to say that the term 'a' denotes 'any.'" (quotation omitted)); *United States v. Otunyo*, 63 F.4th 948, 956–57 (D.C. Cir. 2023) (holding that in the context of a sentencing guideline which provides a certain base offense level depending on if the defendant is convicted of "an offense referenced to this guideline," "'an' is best read to mean 'any one,'" such that the base offense level depends on "if . . . 'any one' of the defendant's convictions" referenced to the guideline); *Kilroy v. Husted*, No. 2:11-cv-00145-GLF-TPK, 2011 WL 3321308, at *3 (S.D. Ohio Aug. 2, 2011) ("The word 'an' is an indefinite article used as a function word before a singular noun and generally signifies 'any' which is a synonym of 'a.'").

With no other limitations in the Arbitration Agreement, the Court finds that the Arbitration Agreement is broad. *See Hildebrand v. Par Network, Inc.*, No. 2:09-cv-02154-CM-KGS, 2009 WL 4508578, at *3 (D. Kan. Dec. 1, 2009) (finding that an arbitration clause referring to "an unresolved dispute by the parties to this Agreement" is "broad"); *cf. Sanchez v. Nitro-Lift Techs, LLC*, 762 F.3d 1139, 1146–47 (10th Cir. 2014) (observing that a "clause contain[ing] no limiting language, either restricting arbitration to any specific disputes or to the agreement itself" is broad).

Because the Court finds that the Arbitration Agreement is broad, the "presumption of arbitrability" is "particularly applicable." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *accord ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995). This means that "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Techs.*, 475 U.S. at 650 (quotation omitted). Through this lens, the Court considers whether Mr. Crostarosa's DPPA claim against PRRS falls within the scope of the Arbitration Agreement.

Mr. Crostarosa argues that it does not, because the Arbitration Agreement is "clearly limited to the specific disputes mentioned in the contract – that being disputes for unpaid parking," while the DPPA claim is "merely collateral" and therefore "beyond the purview" of the Arbitration Agreement. [Doc. 25 at 14]. Mr. Crostarosa contends that the contract between the parties "solely governs disputes that arise from an individual's failure to pay for parking" and does not cover "[t]he fact Defendants pursue unpaid tickets by violating the privacy rights of drivers." [*Id.*] The Court respectfully disagrees.

First, the Court notes that the legal standard that Mr. Crostarosa sets out regarding collateral matters being beyond the purview of arbitration agreements is incomplete. In fact, the case that Mr. Crostarosa cites in support, *Cummings*, explains that while collateral matters will generally be ruled to be beyond the purview of a *narrow* arbitration clause, "[w]here the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." 404 F.3d at 1261 (quotation omitted). As previously discussed, the Arbitration Agreement here is

14

broad and contains no limitations or exclusions.

Second, Mr. Crostarosa offers no argument, only conclusory statements, in support of his contention that the Arbitration Agreement does not apply to the DPPA claim. Mr. Crostarosa states, without any explanation, that "[t]he fact Defendants pursue unpaid tickets by violating the privacy rights of drivers" is a matter beyond the purview of the Arbitration Agreement. *See* [Doc. 25 at 14]. But this position cannot be squared with Mr. Crostarosa's acknowledgment that the Arbitration Agreement applies to disputes arising from a failure to pay for parking. *See* [*id.*]. Indeed, this case was only initiated following Mr. Crostarosa's receipt of a Parking Notice from PRRS stating that his vehicle "was parked on private property on the date of issuance and was in breach of the posted rules and use limitations of the property location identified above," identifying the issue as "[n]o payment received." *See* [Doc. 1 at ¶ 43]. Sending this Parking Notice, Mr. Crostarosa alleges, was not permissible under the DPPA. [*Id.* at ¶ 38]. The DPPA claim therefore implicates the Contract and the Parties' rights and obligations.

Mr. Crostarosa also does not address the fact that his DPPA claims relies on allegations that explicitly "touch matters covered by the parties' arbitration agreement." *See Burlington*, 636 F.3d at 570 (cleaned up). For instance, Mr. Crostarosa alleges that Defendants use their License Plate Recognition technology to identify the license plates on vehicles that have not paid for parking and use that information to access motor vehicle records, including the registrants' personal addresses, in order to mail the registrants a parking notice. *See* [Doc. 1 at ¶¶ 7–11, 16, 44]. The Contract clearly provides that the Lot "may be monitored by License Plate Recognition technology to ensure compliance with the [Lot] rules" and that "[v]ehicles failing to comply with lot rules will be charged

additional parking fees." [Doc. 15-3 at 2]. Matters explicitly referenced in the Contract, i.e. the use of a license plate recognition technology, are certainly within the purview of the Arbitration Agreement.

Thus, the Court finds that Mr. Crostarosa's DPPA claim against PRRS falls within the scope of the Arbitration Agreement. The Motion to Compel Arbitration as to Mr. Crostarosa's claim against PRRS is respectfully **GRANTED**.

## III.    Asura and LAZ

Next, the Court addresses whether Mr. Crostarosa may be compelled to arbitrate his claim as asserted against Asura and LAZ. *See* [Doc. 28 at 13–14]. LAZ and Asura argue that the Court should apply the principles of equitable estoppel: even though LAZ and Asura are not parties to the Contract, Mr. Crostarosa is treating the allegations against all Defendants as "not only . . . closely related, but inseparable" and has alleged "an intertwined and indistinguishable claim against Defendants." [*Id.*]; *see also* [Doc. 24 at ¶ 4]. Thus, they contend, Mr. Crostarosa should be estopped from arbitrating his claim against one Defendant and not the others. [Doc. 28 at 13–14]. Plaintiff opposes, arguing that LAZ and Asura have not made the required showing for a non-signatory to move to compel arbitration. *See* [Doc. 25 at 14–17].

Defendants primarily rely on *Frazier v. Western Union Co.*, which held that a non-signatory to a contract with an arbitration provision may compel arbitration where (1) the plaintiffs' claims against the non-signatory and a signatory to the contract were interdependent, (2) plaintiffs asserted all of their claims collectively against all defendants, and (3) plaintiffs' claims were intertwined with the duties and obligations arising from the contract with the arbitration provision. 377 F. Supp. 3d 1248, 1262–64 (D. Colo. 2019);

[Doc. 28 at 13–14].

However, after *Frazier* was decided, the Colorado Supreme Court issued a decision rejecting this theory of equitable estoppel and disavowing the cases that the *Frazier* court relied on in its analysis:  *Santich v. VCG Holding Corp.*, 443 P.3d 62 (Colo. 2019).  None of the Parties address this decision, but it is dispositive of the issue at hand.

In *Santich*, a group of dancers brought a Fair Labor Standards Act ("FLSA") collective action lawsuit in the District of Colorado against the owners of the clubs where they perform and the club owners' parent companies.  *Id.* at 64; First Amended Complaint, *Santich v. VCG Holding Corp.*, No. 17-cv-00631-RM-MEH (D. Colo. May 12, 2017), ECF No. 65 (*Santich* Complaint).  The plaintiffs brought six claims, including for violations under the FLSA, violations of different states' employment and labor laws, and unjust enrichment.  *Santich* Complaint at ¶¶ 125–194.  The plaintiffs referred to all Defendants collectively frequently throughout the complaint and brought their FLSA and unjust enrichment claims against all defendants without distinguishing between the different entities.  *See generally id.*

The club-owner defendants in *Santich* successfully compelled arbitration based on the arbitration clause included in the agreements that plaintiffs signed with the club owners.  *Santich*, 443 P.3d at 64.  The corporate-parent defendants sought to compel arbitration as well, but they were not parties to those agreements or any other contracts with the plaintiffs.  *Id.*  So, the parent defendants argued that the dancers should be equitably estopped from litigating their claims against one set of defendants because they are in compelled arbitration of the same claims against another set of defendants.  *Id.*

The federal magistrate judge recommended that the district court compel

arbitration on that theory.  *Id.*  The judge relied on a Colorado Court of Appeals case, *Meister v. Stout*, which held that equitable estoppel is available to non-signatories of an arbitration agreement when a signatory to the agreement alleges "substantially interdependent and concerted misconduct by a nonsignatory and one or more signatories" to the agreement.  *See id.* at 64–65; *Meister*, 353 P.3d 916, 921 (Colo. App. 2015), *overruled by Santich*, 443 P.3d 62.  In *Meister*, the plaintiff asserted identical claims against all defendants, arising from an operating agreement which contained an arbitration provision.  *Meister*, 353 P.3d at 921–22.  The plaintiff never assigned misconduct to any defendant individually, instead referring to them jointly as "Defendants."  *Id.*  The *Meister* court held that even though one of the defendants was not a party to the operating agreement and therefore not a party to the arbitration clause, it could compel arbitration under a theory of equitable estoppel.  *Id.*

In reviewing the report and recommendation in *Santich*, the district court noted that *Meister* failed to address one of the traditional requirements of equitable estoppel, detrimental reliance.  *Santich*, 443 P.3d at 64–65.  But, the court explained, it was not clear if this element was required in the arbitration context because the Colorado Supreme Court had not issued any controlling decisions on point.  *Santich*, 443 P.3d at 64–65.  Thus, the district court certified the question to the Colorado Supreme Court.  *Id.* at 65.

The Colorado Supreme Court accepted the certification and began its analysis by stating the rule that generally, only parties to a contract can compel arbitration under that contract and they may only do so as to another signatory of the contract.  *Id.*  There are seven exceptions to this rule, including estoppel.  In Colorado, "equitable estoppel is

generally understood as arising where one party induces another to detrimentally change position in reasonable reliance on that party's actions through words, conduct, or silence." *Id.* (quotation omitted). "However, Colorado law has never favored estoppel" and only applies the doctrine "when all of the elements constituting an estoppel are clearly shown." *Id.* (collecting cases). The four elements of estoppel are:

> [T]he party against whom the estoppel is asserted must know the [relevant] facts; that party must also intend that its conduct be acted upon or must lead the other party to believe that its conduct is so intended; the party claiming estoppel must be ignorant of the true facts; and the party asserting the estoppel must detrimentally rely on the other party's conduct.

*Id.* (quoting *Jefferson Cnty. Sch. Dist. No. R-1 v. Shorey*, 826 P.2d 830, 841 (Colo. 1992).

The *Santich* Court reaffirmed this long-standing principle and rejected the creation of "a new breed of equitable estoppel" in the arbitration context. *Id.* at 65–66. It "disavow[ed] *Meister*'s endorsement of a special estoppel rule predicated upon the interconnectivity of claims and actions taken in concert by signatories and nonsignatories to an arbitration agreement" and held that an estoppel argument raised by a nonsignatory to compel arbitration "must be supported by all four traditionally defined elements of equitable estoppel." *Id.* at 66. The Colorado Supreme Court was mindful that its decision "may result in piecemeal litigation in which related claims simultaneously proceed in court and arbitration," but concluded that "policy reasons alone cannot replace necessary predicates for the application of equitable estoppel." *Id.* at 66 n.2 (cleaned up).

Since 2019, courts in this District have applied *Santich* and required proof of all four elements of estoppel in arbitration contexts similar to the one here. *See, e.g.*, *Schneider v. SRC Energy, Inc.*, 424 F. Supp. 3d 1094, 1101–02 (D. Colo. 2019) (rejecting equitable estoppel argument where the defendant "failed to make a clear showing that it

detrimentally relied upon any conduct by [the] [p]laintiff"); *Robertson v. Rep Processing, LLC*, No. 19-cv-02910-PAB-NYW, 2020 WL 5702296, at *5 (D. Colo. Sept. 24, 2020) (declining to apply the "disfavored" equitable estoppel doctrine because the defendant "cannot demonstrate all four elements of equitable estoppel"); *Adams-Arapahoe Sch. Dist. 28J v. Great Am. Ins. Co.*, No. 22-cv-00461-RM-STV, 2023 WL 2824301, at *14–15 (D. Colo. Feb. 15, 2023) ("Without a showing of detrimental reliance by the . . . Defendants, the Court cannot find that Plaintiff is equitably estopped from bringing its case in court.").[5] *But see Butler* Order (not grappling with *Santich* because the plaintiffs did not raise any arguments that Asura and PRRS are differently situated with respect to the contract at issue). The Court sees no reason to depart from the weight of authority in this District.[6]

Returning to Asura and LAZ, Defendants make no attempt to prove the four elements of estoppel. Nor do Asura and LAZ make any other arguments to explain why

---

[5] *Adams-Arapahoe* is a report and recommendation in a case which settled while the deadline to object was pending, and therefore the District Judge did not have the opportunity to rule on the recommendation. *See* No. 22-cv-00461-RM-STV (D. Colo.), ECF Nos. 166–67.

[6] Defendants' supplemental authority does not change the Court's analysis. *See* [Doc. 40]. Defendants submitted an unpublished Northern District of Texas case, *Tobey v. Ace Parking Management, Inc.*, No. 3:24-cv-02932-X, 2025 WL 1919887 (N.D. Tex. July 11, 2025), which deals with a similar question as here, considering whether a parking lot operator may enforce an arbitration agreement to which it is not a signatory under an estoppel theory. *See Tobey*, 2025 WL 1919887 at *5. This is where the similarities end, however. Unlike Colorado, Texas law recognizes a theory of estoppel called "intertwined estoppel" which allows "compelling arbitration when a nonsignatory defendant has a close relationship with one of the signatories and the claims are intimately founded in and intertwined with the underlying contract obligations." *See id.* It was under this framework that the *Tobey* court concluded that yes, the parking lot operator may enforce the arbitration agreement as a nonsignatory. *Id.* at *5–6. But, as established, Colorado law rejects this theory of estoppel and instead requires proof of all four elements of equitable estoppel. Thus, this supplemental authority is inapposite.

they may enforce a contract to which they are not a party.  Accordingly, Asura and LAZ may not compel Mr. Crostarosa to arbitrate his DPPA claim against them.  Defendants' Motion to Compel Arbitration as to Asura and LAZ is respectfully **DENIED**.

## IV.    Stay of Litigation

Section 3 of the FAA obligates courts to stay litigation on matters that the parties have agreed to arbitrate.  9 U.S.C. § 3; *cf. Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024) (no discretion "[w]hen a federal court finds that a dispute is subject to arbitration[] and a party has requested a stay of the court proceedings pending arbitration").  Because Mr. Crostarosa's claim against PRRS is arbitrable and PRRS requests a stay pending completion of arbitration, [Doc. 15 at 6], the Court must stay the action against PRRS pending arbitration.  However, the action between Plaintiff and Asura and LAZ may proceed.

## CONCLUSION

Therefore, **IT IS ORDERED** that:

(1)    Defendants Asura Technologies USA, Inc. and Parking Revenue Recovery Services, Inc.'s Motion to Compel Arbitration [Doc. 15] is **GRANTED** as to Plaintiff's claim against Parking Revenue Recovery Services, Inc. and **DENIED** as to Plaintiff's claims against Asura Technologies USA, Inc. and LAZ Parking Ltd.;

(2)    Defendant LAZ Parking Ltd.'s Motion for Leave to Join in Motion to Compel Arbitration [Doc. 24] is **GRANTED**;

(3)    Plaintiff, Defendants Asura Technologies USA, Inc., and LAZ Parking Ltd. are **ORDERED** to jointly contact Judge Starnella's Chambers no later than

January 29, 2026 for the purposes of resuming the scheduling of this matter and discussing how the parallel litigation and arbitration will proceed, including whether this action should be stayed pending resolution of the arbitration against PRRS;

(4)     The claim against Parking Revenue Recovery Services, Inc. is **STAYED** pending resolution of arbitration proceedings; and

(5)     Within **10 days** after the completion of the arbitration between Plaintiff and Parking Revenue Recovery Services, Plaintiff and Parking Revenue Recovery Services shall jointly **FILE** a status report describing the results of the arbitration and indicating what, if any, further action each of them intends to take in this case.

DATED:  January 23, 2026            BY THE COURT:

Nina Y. Wang
United States District Judge